## S16A1158. WILLIAMS v. THE STATE.
(794 SE2d 157)

HINES, Presiding Justice.

Anthony Lashawn Williams appeals the denial of his motion for new trial, as amended, and his conviction and sentence for malice murder in connection with the fatal shooting of Jeanette Woodson. He challenges the admission at trial of similar transaction evidence and a portion of the State's closing argument, which he maintains constituted improper comment on his failure to testify. Finding the challenges to be unavailing, we affirm.[1]

The evidence construed to support the verdict showed the following. On November 20, 1992, Woodson's body was found on the side of a dirt road in Terrell County. She had sustained a fatal gunshot wound to her head from a .25 caliber weapon; the bullet had entered her face and pierced her brain stem. Coins, a cigarette lighter, and a wristwatch were found near the body; the wristwatch was broken in a manner consistent with having been forcibly pulled off her wrist. There was dirt on the back of Woodson's head and on the back of her sweater. The time of death was between 4:00 a.m. and 5:00 a.m., and Woodson was standing at the time she was shot. The pockets of her jeans were turned inside out and she had been rolled over, consistent with someone searching her pockets. A crack pipe was found underneath her body. A sexual assault kit was performed on Woodson, and her DNA as well as that belonging to a then unknown male were detected.

Williams and Woodson had both worked the 3:00 p.m. to 11:00 p.m. shift at a local manufacturing company; people working that shift were paid on Thursdays. Usually, the employees would go to a certain liquor store to cash their paychecks and then go "hang out and drink." Both Williams and Woodson were seen near the liquor store on the evening of Thursday, November 19, 1992, just hours before the murder. Approximately a decade later, the male DNA profile developed from sperm recovered from Woodson's mouth and vagina was inputted into the CODIS[2] database and found to match that of Williams.

---

[1] The murder occurred between November 19, 1992 and November 20, 1992. On December 2, 2003, a Terrell County grand jury indicted Williams for malice murder. He was tried before a jury March 8-10, 2004, found guilty of malice murder, and sentenced to life in prison. A motion for new trial was filed on March 23, 2004, and amended on March 8, 2011 and on October 7, 2014. The motion for new trial, as amended, was denied on October 23, 2015. A notice of appeal was filed on November 17, 2015, and the case was docketed to this Court's April 2016 term. The appeal was submitted for decision on the briefs.

[2] CODIS is the Federal Bureau of Investigation's Combined DNA Index System, which includes all 50 states and some federal agencies; it collects DNA profiles given by local

Williams was located in Florida, and he volunteered to go to a local police station. Once there he learned that the questions being asked were from agents of the Georgia Bureau of Investigation ("GBI"); his tone changed, and when Woodson's name was mentioned, Williams, who was wearing a shirt, began to sweat profusely even though others in the room who were wearing jackets were comfortable. When asked if he knew Woodson, Williams said that he did because he worked with her. He admitted to being aware of when she died but denied knowing anything else about her death. When Williams was told that DNA evidence existed, Williams responded that he never had sex with Woodson. The GBI agent then said that he had not mentioned anything about sex in regard to the DNA, and Williams responded that there would be no DNA evidence from him, "either blood or whatever." Williams then blurted out that he "went to work" the day after Woodson's body was found. Williams offered no explanation for the presence of his DNA and denied any relationship with Woodson. He maintained that the last time he saw her was two weeks before her death when she came to the manufacturing company to pick up her last paycheck inasmuch as she had quit her job there. Williams advised the GBI agent that "he thought he knew where this was going" and then "got up and left the interview."

As part of its case-in-chief, the State introduced as similar transactions evidence of Williams's commission of three separate instances of violent assault or battery, with the use of a handgun, against three different victims, all of which incidents resulted in Williams's convictions.[3] The first transaction was an incident involving Williams's former girlfriend, T. J. Williams and T. J. dated for several months before mutually ending their relationship. Subsequently, on August 2, 1992, Williams appeared at T. J.'s home in an apparent attempt to resume their relationship. After arguing with T. J., who was then several months pregnant with Williams's child, Williams placed a handgun to her head and forced her to have sexual intercourse with him. Afterward, T. J. called the police and Williams was arrested; he later pled guilty to aggravated assault and was sentenced for the crime.

The second admitted transaction was an incident involving A. C., another former girlfriend of Williams. The pair had been dating for a year-and-a-half to two years when A. C. unilaterally ended the relationship, much to Williams's displeasure. On April 24, 1998,

---

laboratories, which DNA is taken from arrestees, convicted offenders, and forensic evidence found at crime scenes. *Bharadia v. State*, 297 Ga. 567, 568 n. 3 (774 SE2d 90) (2015).

[3] The State presented the similar transactions via testimony of the victims and the admission into evidence of Williams's related convictions.

Williams appeared at A. C.'s work place, allegedly to repay a sum of money that he owed her. When Williams arrived at the hair salon where A. C. worked, he asked her to go behind the building so they could talk. But, once behind the building, Williams told A. C. that he was not going to pay her the money and he became violent; he punched her twice in the stomach and twisted one of her arms, threatening to break it. Williams picked up a piece of Styrofoam and began to strike her in the head with it, laughing during the attack. Williams then "pulled out" a pistol, pointed it at A. C.'s upper body, and threatened to kill her, causing A. C. to fear for her life. After a brief exchange of words, Williams left the scene, and A. C. called the police. Williams was charged with aggravated assault with a firearm and domestic battery; he entered a plea of no contest to a charge of battery, and was sentenced thereon.[4]

The third transaction at issue was a February 9, 1993 shooting involving Williams and a man, W. A. Earlier that day, W. A. had gotten into an argument with a man, J. M. That evening, a car pulled up to W. A.'s house and his mother told him to go see who it was. When W. A. reached the car, Williams "jumped out" of it and threatened W. A. Williams then pointed a small .25 caliber automatic handgun at W. A.'s head and pulled the trigger, but the handgun did not fire. The two men began to fight, and then several other men exited the car and joined Williams in his attack on W. A. W. A. managed to break free and make it as far as the outside of his house when Williams fired his handgun at him. A bullet grazed W. A.'s head while another struck him in his hip. Williams was charged with and pled no contest to aggravated battery with a firearm and was sentenced for this crime.[5] At the time W. A. was treated for his gunshot wounds, he was told it would be best to leave in place the bullet that was lodged in his hip; however, eventually it was removed in December 2003, and compared with the bullet removed from Woodson's brain. It was determined that the two bullets, which were the same caliber, were fired from the same make and model of pistol.

The trial court noted that the incident involving T. J. was only about four months before Woodson's murder, and determined that it and the incident involving A. C. were sufficiently similar to the murder in regard to the victims, weapons, and sexual overtones so as to be admissible to prove Williams's motive, malice, intent, and bent of mind. The trial court also determined that the shooting of W. A. was

---

[4] The incident and adjudication occurred in Florida. Following Williams's release from jail, the pair briefly resumed their relationship, but it ended again after Williams punched A. C. in the head, leaving her with a fractured skull, broken nose, and two black eyes.

[5] Here again, the crime and adjudication occurred in Florida.

admissible to show Williams's bent of mind, and that the weapon used in both cases had similarities sufficient to establish a logical evidentiary connection to Williams, especially in light of the fact that only about three months separated the shooting of W. A. from the fatal shooting of Woodson. The trial court concluded that the probative value of the evidence of the three transactions outweighed any possible prejudicial effects.

1. Williams does not enumerate as error that the evidence of his guilt was insufficient as a matter of law. Nevertheless, in accordance with this Court's general practice in appeals of murder cases, this Court has reviewed the record for the sufficiency of the evidence and concludes that it was sufficient to enable a rational trier of fact to find Williams guilty beyond a reasonable doubt of the malice murder of Woodson. *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2. Williams contends that the trial court erred in admitting evidence of the other transactions because there were insufficient connections or similarities to Woodson's murder. He argues that the incidents with T. J. and A. C. are dissimilar to the case at bar in that Woodson, unlike T. J. and A. C., was not his "domestic partner," that he did not shoot T. J. or A. C., and that there was no evidence that he needed or intended to intimidate Woodson or that Woodson "told him 'no' for any reason." Williams further argues that the incident involving W. A. was even more different from Woodson's murder than the transactions with T. J. and A. C. in that W. A. is a man with whom there is no assertion that he had a romantic or sexual relationship, and that there was no evidence that the same handgun was used to shoot Woodson and W. A. However, such arguments fail.

In regard to the admissibility of similar transaction evidence under the former Evidence Code, which governed Williams's 2004 trial, the State had to show that it sought to introduce the evidence for an appropriate purpose, deemed to be an exception to the general rule of inadmissibility; that there was sufficient evidence to establish that the accused committed the independent transaction; and that there was a sufficient connection or similarity between such transaction and the charged crime so that proof of the former tended to prove the latter. *Williams v. State*, 261 Ga. 640, 642 (2) (b) (409 SE2d 649) (1991). Furthermore, the trial court had to make findings on the record as to these three showings prior to admission of the evidence. Id. at n. 3. The often determinative question is whether there was a showing of sufficient connection or similarity between the independent transaction and the crime on trial. *State v. Ashley*, 299 Ga. 450, 454 (2) (788 SE2d 796) (2016). In considering this factor, the focus is properly on the similarities, not the differences, between the separate

transaction and the crime or crimes to be tried. Id. However, the independent act does not have to mirror every detail of the charged crime or crimes, "but instead might reflect only a portion of the acts that established one or more of the charges being tried." Id. What is more, "a lesser degree of similarity [is] required to admit evidence of independent acts to show motive or intent than to admit such evidence to prove identity." Id.

On appeal, this Court is to defer to the trial court's findings of fact unless they are clearly erroneous, and the decision to admit similar transaction evidence is to be upheld absent an abuse of the trial court's discretion in doing so. *Dillard v. State*, 297 Ga. 756, 759 (3) (778 SE2d 184) (2015). There was no such abuse of discretion in the present case. As is obvious, like Woodson's murder, the three separate transactions involved Williams perpetrating violent acts with the use of a handgun, and his targeting of the heads of his victims. Moreover, the shooting of W. A. was with precisely the type of handgun used to kill Woodson. The acts with T. J. and W. A. were also close in time to the murder. And, as the trial court found, the incidents with T. J. and A. C., like the fatal encounter with Woodson, were with women with whom Williams obviously had some sexual involvement and shows his bent of mind to intimidate and physically assault them. The admissibility of similar transaction evidence has been viewed more liberally in the context of sexual assaults. See *McBee v. State*, 228 Ga. App. 16, 19 (1) (491 SE2d 97) (1997).

Simply, there was no abuse of the trial court's discretion in admitting the independent transactions at issue.

3. Lastly, Williams contends that during its closing argument, the State improperly commented in three instances on his failure to testify and/or his silence to law enforcement officers.[6] However, there was no objection at trial to the now challenged comments by the prosecutor, so Williams has waived his right to rely on the alleged impropriety of such comments as a basis for reversal of his conviction.[7] *Scott v. State*, 290 Ga. 883, 885 (2) (725 SE2d 305) (2012).

---

[6] Williams cites the following comments:
    (1) "[Williams] had a chance to say, 'Oh, yeah. Oh, yeah; I remember. I did see her that night. I had sex with her.' But he didn't."
    (2) "[Williams] quit talking to [investigators] and walked out the door."
    (3) "You'd never get [Williams] to admit he paid for it, sex."

[7] This Court will not examine the challenged portions of the State's closing argument under a plain error review inasmuch as at the time of Williams's trial in 2004, such review was limited to alleged error in the sentencing phase of a trial resulting in the death penalty, a trial court's expression of opinion in violation of OCGA § 17-8-57, and a jury charge affecting substantial rights of the parties as provided under OCGA § 17-8-58 (b). *Durham v. State*, 292 Ga. 239, 240 (2) (734 SE2d 377) (2012).

*Judgments affirmed. All the Justices concur.*

DECIDED NOVEMBER 21, 2016.

*Robert M. Thomas*, for appellant.

*T. Craig Earnest, District Attorney, Ronald S. Smith, Assistant District Attorney; Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew B. Crowder, Assistant Attorney General*, for appellee.